ROY A. BITLER. APPELLEE, V. TERRI LEE, INC., APPELLANT.

81 N. W. 2d 318

Filed March 1, 1957. No. 34013.

*Ginsburg, Rosenberg & Ginsburg,* for appellant.

*Clarence M. Pierson, Elmer M. Scheele,* and *William D. Blue,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This is an action on a written contract of employment

brought by appellee to recover damages from appellant for alleged wrongful termination of the contract and the discharge of appellee from his employment.

The circumstances of the first cause of action asserted by appellee are: Appellant is a domestic corporation authorized to manufacture and sell dolls and doll accessories. A contract was made by the parties on or about October 24, 1951, as of April 15, 1951, by which appellee was employed for a period of 3 years commencing April 16, 1951, to be the plant manager of the factory of appellant and to look after the production, manufacture, and shipping of products to be sold by it in its business. Appellee was obligated by the contract to loyally serve appellant, to keep all information obtained by him during the employment confidential, and to refrain from becoming associated with any competing business until 1 year from the date of the termination of his employment by appellant. A copy of the contract was made a part of the cause of action. The compensation of appellee was $150 per week; an annual bonus of $5,000 for each year if the sales of appellant were not less than its sales for the year immediately preceding the commencement of the contract and if the margin of gross profit of appellant on its sales was not less than the margin of gross profit received by it for the year immediately preceding the commencement of the contract; and an additional yearly bonus of 2 percent of gross profit on sales of appellant in excess of $500,000 per year if its sales were increased to that amount for any year during the employment of appellee and if the percentage of gross profit of appellant should not be less than the percentage of gross profit received by it on its sales the year next preceding the commencement of the contract. Appellee entered upon the performance of the duties of his employment April 16, 1951; faithfully and competently performed all things required of him to be done; and has been and is able, willing, and ready to fully perform the contract of employment according to its re-

quirements. The appellant on or about September 15, 1952, without cause, wrongfully terminated the employment of and discharged appellee. During the periods covered by the written contract to and including the year ending April 15, 1954, the contingencies and conditions precedent to appellee being entitled to a bonus of $5,000 for each of the periods of April 15, 1952, to April 15, 1953, and April 15, 1953, to April 15, 1954, and appellee being entitled to an additional yearly bonus of 2 percent on the amount of the gross sales of appellant in excess of $500,000 occurred and were satisfied but no part thereof has been paid to appellee. The weekly salary was paid to appellee according to the contract to September 15, 1952. The amount claimed due appellee on the first cause of action is stated.

The second cause of action of appellee is based on these claims: In March 1951 the parties made a separate and independent oral agreement that appellee would be paid expenses of traveling from Lincoln to Fair Lawn, New Jersey, where his family resided, and the expenses of transporting appellee, his family, and his household furnishings from Fair Lawn, New Jersey, to Lincoln. The agreement was made by appellant with appellee as an inducement of his execution of the written contract described in the first cause of action and the consideration for the oral agreement was the promise of appellee to enter into the written contract. Appellee relied on the oral agreement and incurred the expenses and costs contemplated by it, the amount of which is stated.

The third cause of action of the petition of appellee was dismissed in the trial court because of insufficient evidence. The judgment of dismissal has become final and no further mention of it will be made.

The answer of appellant to the first cause of action of appellee consists of the following: Admission of its corporate existence and capacity as claimed by appellee and that the exhibit attached to the petition is a copy of the written contract of the parties made under

date of October 24, 1951, a denial of all other matters asserted in the first cause of action, and affirmative defenses which will be detailed if required later herein. The answer of appellant to the second cause of action admitted its existence and corporate capacity as claimed by appellee and denied all other statements made therein. The reply of appellee was a denial of all new matter contained in the answer of appellant.

The trial of the case resulted in a general verdict for appellee and against appellant for the gross amount of $43,443.40. The motion of appellant for judgment notwithstanding the verdict or, in the alternative, for a new trial, was filed May 13, 1954. It was argued and submitted to the court and thereafter on January 31, 1956, the district court by order of that date set aside and vacated all of the verdict of the jury in excess of the sum of $9,398.60 and rendered judgment in favor of appellee and against appellant on the first cause of action in the sum of $8,462 and on the second cause of action the sum of $936.60, a total of $9,398.60 with interest thereon at 6 percent per annum from May 4, 1954.

Violet Gradwohl, referred to herein as Mrs. Gradwohl, was the president of appellant. She was in New York in March of 1951 in the interest of the corporation, displaying dolls at the annual toy fair. She had under consideration the employment of a production manager for the factory of appellant at Lincoln. She met appellee and they had a general conversation on March 20 or 21, 1951. He gave her a printed statement of his background in management planning and coordinating over-all plant production operation and of his experience and accomplishments as plant manager in two locations for considerable periods of time. Mrs. Gradwohl said that she was president of appellant and that she intended to employ a plant manager before she returned to Lincoln. She asked appellee to contact her the next day and they would continue their conversation. They met as she suggested. Appellee testified that she said she

was looking for a good man who was qualified in manufacturing and the over-all problem was discussed. She said she had a small factory and production in Lincoln; that she was not able to produce all of the orders she had for the 1950 Christmas business; that she had gross sales of $220,000 the previous year and she spoke of the margin or percentage of profit on the sales; that if he decided to accept employment by appellant, she would give him $150 per week, a $5,000 bonus each year for a 3-year period if he got the business up to $500,000, and an additional bonus on a gross profit set-up of 2 percent of the gross profit on the volume in excess of the first $500,000; that the gross profit was to be 50 percent of the gross business; that she would pay the expense of three round trips from New York to Lincoln and return and the moving expenses of appellee and his family from Fair Lawn, New Jersey, to Lincoln; that she would allow appellee a month's vacation with pay each year; and that when appellee came to Lincoln and started work for appellant she would have her attorney, Mr. Ginsburg, "draw up a written agreement concerning everything that we determined in her room in the Hotel New Yorker."

Appellee came to Lincoln, made the investigation he desired, accepted the offer he claims Mrs. Gradwohl made in New York, and on April 3, 1951, returned to his home in Fair Lawn, New Jersey. He said he was paid for the expense of that trip. He returned to Lincoln April 15, 1951, and commenced his employment by appellant April 16, 1951, in the capacity stated in the written contract.

The first draft of the written contract was prepared by Mr. Ginsburg. A copy of it was delivered to appellee and he had it for at least 3 days, consulted with his attorney in reference to it, and returned it to Mr. Ginsburg with suggestion for a change in it. The final draft of the contract, a copy of which is attached to the petition, was prepared by Mr. Ginsburg as appellee re-

quested. It was approved and executed by the parties to it. It bears date October 24, 1951, but was to be effective as of April 15, 1951, as recited therein. Appellee testified that the intention was to include in the written contract all of the terms of the agreement made by him with appellant and that the written contract does that. Appellee made no representation or claim to Mr. Ginsburg about appellant having agreed to pay appellee for travel or moving expenses when Mr. Ginsburg was receiving information and instruction concerning the terms and provisions of the contract preliminary to preparing it; neither did appellee mention that he claimed that there was such an agreement at the time he suggested to Mr. Ginsburg a change in the first draft of the written contract or at any other time. Appellee testified that he made no claim for moving expense of himself and his family to Lincoln before he filed this lawsuit October 22, 1952.

Mrs. Gradwohl testified that she made no agreement with appellee to pay him any travel expense or any expense of moving his family to Lincoln except she agreed to pay the expense of his trip to Lincoln to investigate concerning the proposed employment; that if he decided to enter the employ of appellant she would pay the plane fare back to New Jersey from Lincoln; and that she paid appellee exactly what she agreed in this respect.

The proof does not sustain the contention of appellee that the alleged oral agreement concerning the travel expense, the expense of transportation for his family, and the cost of transporting his household furnishings, as pleaded in the second cause of action, was a collateral oral contract separate and distinct from and independent of the written contract made by the parties; that the parol agreement was the inducement of appellee executing the written contract; and that the execution of it by him was the consideration for the oral agreement. The evidence is convincing that the negotiations had by the parties concerned the single matter of the employ-

ment of appellee by appellant and the offer made by appellant to appellee concerning it consisted of one conversation had in New York. The obligation of appellant to appellee if he accepted the offer and performed the duties it required was, as testified by appellee, enumerated in that conversation as a connected whole, namely, weekly salary, bonuses upon certain conditions, travel expenses incurred by appellee, and the cost of moving his family and household furnishings from New Jersey to Lincoln. It is true there is disagreement of the parties as to how much travel expense appellant was obligated to pay appellee and as to any liability of appellant to appellee for the expense of his moving his family and household furnishings but whatever was said concerning these was said in that one conversation which constituted the negotiations for the employment of appellee by appellant. Whatever was the offer there made was the subject matter concerned in and evidenced by the written contract subsequently made and acted upon by the parties. It was the understanding at the conclusion of the negotiations in New York that if appellee accepted the offer made him by Mrs. Gradwohl after he had made an investigation in Lincoln, everything comprehended in the offer would be made the subject of a written contract of the parties to be prepared by Mr. Ginsburg who was referred to as her attorney. The written contract was prepared in October of 1951 after appellee had discussed what it should contain with Mr. Ginsburg. A draft of the contract was given appellee. He had it for several days, consulted his attorney concerning it, and suggested a change in it which was made when the contract was finally written. Appellee at that time made no claim of the now-asserted oral agreement concerning travel and moving expense. He testified at the trial that it was the intention of the parties that the written contract should express and evidence the whole of the agreements of the parties and that the contract prepared and executed does that. He also testified that he made

no claim for moving expenses until he filed the lawsuit on October 22, 1952.

Appellee may not extract from negotiations resulting in his employment an understanding which he claims was arrived at by the parties concerning his travel and moving expense and frame a cause of action thereon independent from and in disregard of the written contract of the parties subsequently made which concerns the subject matter of the negotiations. The understanding of the parties resulting therefrom may not be thus fragmentized. Whatever was said by the parties concerning the travel and moving expense was, as shown by the testimony of appellee, a part of the conversation concerning and relating to his employment by appellant and any oral understanding by the parties concerning it should have been, and to be effective was required to be, included in the written contract. It is said in Hoerger v. City State Bank, 151 Neb. 321, 37 N. W. 2d 393: "Where negotiations take place between parties which result in their reaching an agreement in reference to the subject matter of the negotiations, and the parties reduce their agreement to writing, sign and deliver the same, such writing, in the absence of fraud, mistake, or ambiguity in the writing, constitutes the best and only competent evidence of the contract."

The following is contained in Annotation, 33 A. L. R. 2d 968: "All oral negotiations or stipulations between the parties, preceding or accompanying the execution of the written instrument, are regarded as merged in it, and the instrument is treated as the exclusive medium of ascertaining the agreement of the parties to it. * * * The reason for this rule is that it is only reasonable, where parties have entered into a written agreement, to suppose that they have introduced into the instrument every material term and circumstance; and, consequently, all parol testimony of conversations made by either of them, whether before or after, or at the time of, the completion of the contract, will be rejected. * * * With

respect to the first-mentioned theory (adding by parol evidence to the contract evidenced by writing), it has been well said that the rule forbids to add by parol where the writing is silent, as well as to vary where it speaks, that generally it will be presumed that the parties have introduced into the written contract every material item and term, and that parol evidence connot be admitted to add another term to the agreement, although the writing contains nothing on the particular feature to which the parol evidence is directed." See, also, Barkalow Bros. Co. v. English, 159 Neb. 407, 67 N. W. 2d 336; Ford v. Luria Steel & Trading Corp., 192 F. 2d 880; 20 Am. Jur., Evidence, § 1099, p. 958.

The second cause of action has not been brought within any exception to the general doctrine expressed in and sustained by the above authorities. The record does not sustain the second cause of action. The submission of it to the jury was erroneous and prejudicial. The recovery allowed appellee thereon cannot be sustained.

Appellee was employed by appellant as plant manager of its factory in Lincoln to superintend it and to look after the production, manufacture, and shipping of products sold by it in the conduct of its business. The service of appellee, because of the contract of employment with appellant, commenced April 16, 1951, and continued at the Lincoln factory until it was totally destroyed, except the records of appellant, December 15, 1951. The business of appellant was the manufacture of quality dolls, doll garments, and accessories consisting of stockings, shoes, and many other items that were appropriate for the many and various types of dolls that were made by appellant. The objective was to produce and market a doll that would look as nearly as possible like a real child and for which clothing and accessories were available and of such a nature that they could be put on the doll and changed by a child. This idea was developed by Mrs. Gradwohl commencing in 1946. Appellant

was incorporated in 1948 and it thereafter conducted the business as a quality production until its factory was destroyed by fire in December of 1951. In January 1952 appellant secured and equipped a small plant in Lincoln in which it resumed the making of doll garments and clothing. It did not have space or capacity for any other department of the normal activity of the appellant.

A site for a factory and a building thereon were purchased by Mrs. Gradwohl in Apple Valley, California, about the first of March 1952, and she then made arrangements to have the building put in proper condition for and equipped as a plant in which the business formerly conducted in Lincoln could be pursued. Production of dolls was commenced at the California plant about May 10, 1952. There were some dolls ready for shipment about May 15, 1952. The first shipment of dolls was made from there about May 26, 1952. The plant commenced operations with 6 or 7 employees. The number was soon increased to about 20 but they were new employees with substantially no experience or training for the work to be done. Many problems developed that made any production almost impossible. The situation did improve and about the middle of June 1952 the number of employees had increased to about one-third as many as were employed at the time of the fire in December 1951 but at that time other difficulties arose. Production slowed down, employees were laid off, and production substantially ceased. There was a delay then until July 5 or 6, 1952. Appellee was from about May 10, 1952, to July 10, 1952, production manager of the plant at Apple Valley, California. A new production man was placed in charge of the plant on July 10, 1952. Appellee was made receiving and shipping clerk and was permitted to interview applicants for employment but the new manager decided if the applicant should be employed and if engaged where he would work. Appellee continued in this capacity until September 15, 1952, on which date his services were discontinued and he then

left and did not return to the plant. He thereafter had no connection with or knowledge of the business. The business conducted in California commencing in May 1952 referred to above was by a partnership consisting of Violet Gradwohl and Grace Hast, the name of which is Terri Lee of California.

Appellee, prior to his employment by appellant, was for 3 years plant superintendent of a company in New Jersey that manufactured a general line of toys and games. He was also employed by a company and became and was for several years manager of its Long Island City, New York, factory. This company also made toys and games. The character and scope of the specific duties performed by him in these two engagements are not mentioned in the record. It is not shown that appellee had any instruction or training in cost accounting. He had not before the employment concerned in this case had any experience in the making and disposing of articles of the kind and character of those produced and sold by appellant. The materials and supplies required by appellant in the conduct of its business were purchased by Mrs. Gradwohl or by her immediate direction. She decided what appellant would obligate itself for in this regard, she determined what appellant should receive for any item it sold, and she controlled the labor employed and the compensation paid. Appellee fixed no prices, made no sales, and produced no customer. These were matters in the exclusive province of Mrs. Gradwohl. In short, the policies, practices, and activities of appellant were determined by her and her decisions and directions were final. The obligation of appellee in reference to these was only to perform her directions and decisions insofar as they operated in his sphere of employment. The knowledge appellee had of the business operations of appellant as a manufacturing concern was limited to the contact he had with them during the brief periods of April 16, 1951, to December 15, 1951, and from May 10, 1952, until September

15, 1952, under the circumstances recited above.

The contract of the parties was that appellant employed appellee for a period of 3 years commencing April 16, 1951, as plant manager of the factory of appellant in Lincoln, Nebraska; that appellee agreed to serve appellant as such plant manager, devote his time and best efforts to the superintendence of the factory, and look after the production, manufacture, and shipping of products sold by appellant in its business to its best advantage and interest; and that the compensation to be paid appellee by appellant was $150 per week, an annual bonus of $5,000 if its sales and the margin of gross profit were not less than during the year preceding the going into effect of the contract, and, if its sales were increased to $500,000 per annum, appellee should receive from appellant an additional bonus of 2 percent of the gross profit of appellant on sales over $500,000 if its percentage of gross profit was not less than its percentage of the gross profits received on its sales for the year preceding the commencement of employment of appellee as evidenced by the contract. Appellee was paid the weekly salary to September 15, 1952, as required by the contract. He was paid $5,000 referred to by him as his first-year bonus in this manner: Two-fifths thereof October 15, 1951; "The second part of my bonus was paid to me on December 15, 1951, and then the last of the bonus was paid early the following year" (1952). The $5,000 was obviously not paid after or because of a determination of the amount of the sales and the margin of gross profit the first year of the employment of appellee because appellant operated on a fiscal-year basis ending March 31 of each calendar year of which appellee was advised and in which he concurred. The contract conditions made it impossible to determine, when the three installments were paid appellee aggregating $5,000, that an annual bonus of $5,000, or any bonus, was or would be due appellee. These things could not be ascertained until after March 31, 1952. There has been

no amount paid appellee by appellant because of the contract in addition to the weekly salary and the $5,000 discussed above.

The contract made it necessary to determine by some method the amount of the sales of appellant during its fiscal year ending March 31, 1951, and its margin of gross profit for that period; likewise the gross sales and margin of gross profit for each fiscal year thereafter had to be determined. This was discussed by the parties when the matter of a bonus to appellee was considered and specified. Mrs. Gradwohl advised appellee that appellant had an accountant, Dana F. Cole, and that he supervised the books of appellant. Nothing was said concerning any change in the bookkeeping set-up of appellant or the manner of computation of gross profit. The books were to be continued to be kept by Dana F. Cole just as they had been in the past. The percentage of margin was a matter of bookkeeping and appellee understood that the percentage of margin of profit realized by appellant would be determined by Dana F. Cole on a fiscal-year basis.

Dana F. Cole set up the bookkeeping system for appellant when it was incorporated in 1948, has since had supervisory charge of the books, and has made computations and determined the gross margin realized by appellant from its business. There has been no change in his procedure in this regard. He has been a public accountant in Lincoln for about 37 years; maintains a place of business in the Stuart Building in Lincoln; has a staff of from 12 to 18 persons in his employ; does public accounting consisting of auditing and setting up books; advises on all types of management problems, cost accounting, and supervision of cost accounting; determines gross margins of profit on sales; and does income tax work. He is professor of accounting at the University of Nebraska. He has taught accounting and tax work at the University since 1915 except as he was interrupted by military service. He has written and had published

several books referred to as accounting and laboratory manuals. He is and has been accountant and auditor for appellant since its inception. His services for it have included designing the accounting plans, preparing and making interim and annual reports, preparing tax returns, making regular accounting audits prepared for annual statement purposes and for tax purposes, and aided in the organization and reorganization of companies. He has been and is familiar with the books of the company, the items that go into the sales made by it, the items that enter into the cost of the manufacturing done by the company, and the items constituting the gross margin resulting from its operations.

There were organized during the period commencing in May 1952 until September 30, 1953, by Mrs. Gradwohl and others, a partnership and five corporations. Mrs. Gradwohl was a member of the partnership and was president of each of the corporations. This was done for business reasons not important to be here reviewed and detailed. It is sufficient for this case that it was stipulated that for the purposes of this action appellee was permitted to consolidate the sales of these organizations, the sales of appellant, and all the gross profit thereof for each applicable year. Dana F. Cole has been the accountant for the partnership and the five corporations mentioned since the organization of each of them.

Appellee, by cross-examination of Dana F. Cole, introduced information which he had secured from the books of appellant as follows:

The gross sales of Terri Lee Doll Factory for the fiscal year ending June 30, 1953, were $26,528.09. The cost of producing the goods sold was $14,843.11. The margin of gross profit was 44.05 percent. The gross sales of this company from July 1, 1953, to March 31, 1954, were $39,800.93. The cost of producing the goods sold was $18,488.89. The percentage or margin of gross profit was 53.55 percent.

The gross sales of Ray Sheen Wig Corporation for the

fiscal year ending August 31, 1953, were $82,940.20. The cost of the goods sold was $52,688.42. The margin of gross profit was 36.47 percent. The gross sales of this company from September 1, 1953, to March 31, 1954, were $42,418.80. The cost of the goods sold was $30,-057.71. The margin of gross profit was 29.14 percent.

The gross sales of Connie Lynn Manufacturing Corporation for the fiscal year ending September 30, 1953, was $193,893.17. The cost of the goods sold was $139,-749.15. The margin of gross profit was 27.92 percent. Gross sales of this corporation for the period of October 1, 1953, to March 31, 1954, were $75,548.09. The cost of the goods sold was $63,080.45. The margin of gross profit was 16.50 percent.

The gross sales of Terri Lee Sales Corporation for the period ending March 31, 1954, were $1,301,587.91. The cost of the goods sold was $1,033,099.53. The margin of gross profit was 20.63 percent.

The gross sales of Terri Lee Fashions for the period ending March 31, 1954, were $259,455.60. The cost of the goods sold was $175,758.02. The margin of gross profit was 32.25 percent.

The gross sales of Terri Lee of California, a partnership, for the fiscal year ending April 30, 1953, were $696,-290.05. The cost of the goods sold was $460,067.99. The margin of gross profit was 33.93 percent. The gross sales of this company from May 1, 1953, to March 31, 1954, were $527,189.07. The cost of the goods sold was $442,-947.46. The margin of gross profit was 15.98 percent.

Appellee also adopted and introduced in the record the determination of the accountant made from the books of appellant that the sales of Terri Lee, Inc., the appellant, for the fiscal year ending March 31, 1951, were $223,097 and its sales for the fiscal year ending March 31, 1952, were $557,504.56. Appellee did not place in the record the cost of the production of the goods sold by appellant during either of these periods

as determined by the accountant from the books of appellant.

The accountant testified in detail concerning the cost of producing the goods sold by appellant during these periods as evidenced by and determined from its books. He said: The sales of appellant for the fiscal year ending March 31, 1951, were $223,097.34. The cost of the goods sold was $133,817.07. The gross margin was $89,280.27. The percentage of gross profit was 40.02 percent. He arrived at the cost of the goods sold in this manner: He added the beginning inventory, $16,570.03; the purchases, $81,096.05; and freight, $3,318.80. From the total of these, $100,984.88, he subtracted the ending inventory, $31,676.06, resulting in a balance of $69,308.82, to which he added labor expense of $44,696.53 for a total of $114,005.35. He added to the last amount depreciation on machinery and equipment, $2,693.46; packing and handling, $6,630.95; factory supplies, expenses, and direct supplies used in factory for repair, $5,044.01; and royalties, $5,443.30, or $19,811.72, and arrived at the sum of $133,817.07 as the cost of producing the goods sold during the fiscal year ending March 31, 1951. The sales of appellant for the fiscal year ending March 31, 1952, were $557,504.56. The cost of the goods sold was $412,443.56. The gross margin was $145,061 and the percentage of the margin was 26.02 percent. The accountant analyzed the precedure and method of arriving at the cost of the goods sold during this period as he did for the fiscal year ending March 31, 1951, and detailed above. This procedure and method were consistent and identical with the accounting procedure and method used by the accountant in the work done for appellant through the years of its existence and for the other companies referred to above since their organization. The same method and procedure were used by the accountant in arriving at the matters concerning which he testified in this case. The figures and amounts given by the accountant were the ones used and

included in the annual income tax returns made by the companies.

There was a recovery in 1952 of insurance by appellant on account of the loss of its factory by fire December 15, 1951, and the propriety of including any part of it in the consideration of the margin or percentage of gross profits is disputed. It is not important to resolve this problem because if the proportionate part of the insurance money received which might be allocated to the gross margin of that year is added to it, the total would be $213,831.98 instead of $145,061 as determined by the accountant and the total percentage would thereby be increased to 34.14 percent instead of 26.02 percent.

The accountant testified that the sales of appellant for the fiscal year ending March 31, 1953, were $426,-772.04, the cost of the goods sold was $332,187.87, the gross margin was $94,584.17, and the percentage was 22.16 percent. If the proportionate part of the insurance money received by appellant which might be allocated to the gross margin for the fiscal year ending March 31, 1953, as the accountant testified, is added to it, the total gross margin would be $126,472.09 instead of $94,-584.17 and the percentage would thereby be increased to 27.57 instead of 22.16 percent.

The accountant consolidated the figures he had given of actual sales and actual gross margins of all the companies that had fiscal years ending in 1953 and thereby he found that the sales of the group amounted to $1,-426,423.55, that the gross margin was $426,897.01, and the percentage of margin was 29.93 percent. He made another consolidation of the total amount of all sales and the total of all gross margins he had given in his testimony for the entire period involved and this shows total sales of $2,522,080.45, a total gross margin of $534,-039.47, and a percentage margin of 21.17 percent.

Appellee relies almost exclusively on his testimony as evidentiary basis for his conclusion that the conditions of the contract of employment have been complied with

and that he is entitled to each of the bonuses specified in the contract. His testimony, insofar as it was intended to establish cost of production, margin of gross profit, and percentage of gross profit, is unsupported by any record, data, or corroboration. The facts elicited by appellee by cross-examination of Dana F. Cole, the accountant, on these subjects are contradictory of the testimony and contention of appellee. He boldly and positively asserts that he kept a record of the cost of goods sold and the sales. He did not exhibit or attempt to place in evidence such a record during the trial of the case. He was asked at the trial if he kept records of any kind of the production during the period between April 16 (1951) and December 15 (1951). His answer was: "I kept my own record in my wallet of the amount of business we shipped each day, and each day, if we would ship $6,000.00, I'd add it to the previous total for that particular month." This is the only mention in the record of this case that has been found of any claim that appellee made a record of any kind concerning any part of the business of appellant while he was employed by it. The evidence of appellee just quoted makes no mention of any record made or kept by him "of the cost of goods sold." He did not produce or offer any record or other data from which the "cost of goods sold," the margin of gross profit, or the percentage of margin of gross profit could be determined except the information given by the accountant referred to above.

The determination of the cost of production of manufactured goods, the gross margin, and the percentage of gross profit of the organization concerned would generally and logically be expected to be done from the books in which were recorded the facts of its day-to-day transactions and activities and according to usual and ordinary accounting practices. The record in this case shows quite clearly a definite understanding and contemplation of the parties to the contract that such a procedure should obtain in this instance. This is even recog-

nized by appellee. In the consideration of the contemplated employment of him by appellant the facts were discussed that it had an accountant; that he had set up the bookkeeping system used by appellant; that he had supervised and surveyed the books of appellant from time to time; that he had done all of the accounting and auditing work for appellant; that he prepared all its financial statements, reports, and tax returns; and that he had made computations of its gross margin of profit and the percentage thereof. It was understood that the books of appellant would continue to be kept by the accountant as in the past, that the matter of determining the percentage of margin of profit of appellant was a matter of bookkeeping, and that appellee understood that it would be done in the future by Dana F. Cole, the accountant, as he had done it in the past. It is convincingly certain in this case that the parties did not contemplate that such matters as gross sales, gross margins of profit, or the percentage thereof of appellant should or could be decided on information and data less definite, certain, and satisfactory than the information and evidence contained in its books kept in the ordinary course of its business. The law requires the best evidence available. A claimant of substantial damages must, to prevail, furnish appropriate data to enable the trier of fact to find the amount of damages with reasonable certainty and exactness if the evidence of damages or the amount thereof are susceptible of definite proof. They may not be established by conjecture, speculation, or doubtful proof.

The record of the financial operations of appellant was available in its books. Appellee examined the accountant of appellant very extensively as to information he had secured from the books. All the definite amounts of sales of goods by appellant put in the record by appellee were precisely the amounts the accountant disclosed in his testimony were recorded in and evidenced by the books of appellant on that subject but appellee

elected to attempt to evade the additional information contained in the books of appellant and testified to by the accountant directed to the cost of the production of the goods sold, the margin of gross profit, and the percentage thereof. No objection has been made and no issue raised that the books and records of appellant presented at the trial through the accountant were not fair, accurate, complete, or a correct representation of the activities of appellant. The data furnished from the books, the integrity of which has not been challenged, cannot be overcome by conclusions, speculations, projections, or theorizing such as appellee has offered in this case. The matter of sale of goods by appellant, cost of producing the goods sold, the margin of gross profit, and the percentage of gross profit are matters that admit of reasonably exact calculation under the circumstances of this case.

Reference is made by appellee to the fact that he contends that the additional bonus of 2 percent was based on gross profits of appellant being figured at 50 percent of the gross sales. This basis is employed in this respect in his computations in this case. Proof of this contention does not appear in the record except in the unsupported statement of a conclusion by appellee. There is no evidence that it was a representation or obligation as to what the gross profit had been in the past or would be in the future. Appellee says the "margin of profit or percentage was 50% or less" for the fiscal year ending March 31, 1951. This is the character of uncertainty, speculation, and statements of conclusions upon which appellee rests his case. The uncontradicted evidence of the record is that the percentage of gross profit of appellant for the fiscal year ending March 31, 1951, was 40.02 percent. This was established by its books. The purpose and attempt of appellee, without any knowledge of the facts, are to make it appear that the percentage of gross profit for that year was 50 percent. The statement of Mrs. Gradwohl made before

the end of that fiscal year does not clash with the fact that the actual percentage of gross profit was 40.02 percent. Appellee testified only that "she estimated the gross profit to be 50%" for the year ending March 31, 1951.

The testimony of appellee, in an attempt to establish compliance with conditions precedent of the contract of employment relative to the matter of bonus, was pointed to gross mark-up for an individual doll. It did not purport to cover gross margin on sales. The two are entirely different things. Gross margin on sales of manufactured goods must include overhead and selling expense of the year's operation. Appellee was asked what was the average profit on dolls and his answer was: "The gross profit *on a doll* was *at least* 50%." (Emphasis supplied.) Likewise, when he was asked how he computed gross margin of profit on sales, he said it is the cost of goods sold deducted from the gross sales but when the inquiry was made as to how he arrived at the cost of the goods sold he replied: "The cost of the goods sold includes the cost of the item, *cost of material,* and *cost of the labor.*" (Emphasis supplied.) The method attempted by appellee violated recognized accounting procedure. The accountant testified that it is improper to consider each article by itself in ascertaining gross margin and that it requires a consideration of the overall picture as between total sales and the arrived-at cost of the goods sold in order to determine gross margin. It is the actual result sustained during a period of time, usually the fiscal year of the company.

Appellant had business interruption insurance when its factory was destroyed December 15, 1951. There was evidence that an adjustment of this was made on the basis of the payment of $73,000 to appellant. Appellee was asked if he could calculate the amount of gross profit that $73,000 received from the business interruption insurance would represent. He was permitted, over comprehensive and proper objections, to testify that the

figure was $300,000. He was allowed to testify that based on $300,000 worth of production that would have occurred in the balance of December, January, February, and March, the fiscal year ending March 31, 1952, the gross profits would be 50 percent of the gross sales or $150,000 and that 2 percent of that is $3,000 which is his bonus based on his agreement of 2 percent of the balance over and above the $500,000 figure. It hardly requires argument or authority to conclude that this was without foundation, was speculative, a conclusion, inadmissible, and prejudicial.

An inquiry was made of appellee if he could give the jury a picture of the production record of the company in California as of September 15, 1952. He answered by saying he would have to estimate; that he could not give an exact picture. He later said, presumably as an estimate but not as a fact that he knew, that 35,000 dolls were produced in California at the Apple Valley plant from May 15, 1952, to September 15, 1952, and this number at $8 a doll would be $280,000. He was asked what appellant charged for a doll and he said dolls ranged from $6 to $295. When asked what the gross profit on the dolls was he said it exceeded 50 percent. This evidence had no probative value as to what the sales were, what the cost of production of the goods was, or what the margin of gross profit or the percentage of gross profit was. Appellee discontinued his employment by appellant on September 15, 1952, and left its place of business. He did not return thereafter and had no contact with or knowledge of the affairs or activities of appellant. The only evidence of its operations thereafter is the testimony of the accountant and it in no way sustains any claim of appellee.

The proof of damages because of breach of a contract must be made with a reasonable degree of certainty. The damages, to be recoverable in such a case, must not be remote or speculative. There must be sufficient data produced by the claimant to permit a determination with

reasonable certainty of the loss occasioned by the breach relied upon.

In Harper v. Young, 139 Neb. 624, 298 N. W. 342, it is said: "The rule is that damages which are uncertain, contingent, conjectural, or speculative, cannot be made the basis of a recovery, whether applied to the existence, nature, or proximate cause thereof. 17 C. J. 753; 15 Am. Jur. 409, sec. 19; Williams v. Hines, 109 Neb. 11, 189 N. W. 623."

It is stated in Gallagher v. Vogel, 157 Neb. 670, 61 N. W. 2d 245: "In such an action, the plaintiff will be called upon, in order to recover substantial damages, to furnish such data to enable the court, with a reasonable degree of certainty and exactness, to estimate the actual damages, and if he fails to do this he can recover only a nominal sum."

Restatement, Contracts, § 331, p. 515, states the rule: "Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty."

It is declared in Paxton & Gallagher v. Vadbonker, 1 Neb. (Unoff.) 776, 96 N. W. 378: "Where damages are susceptible of actual computation, the amount thereof should not be left to conjecture." See, also, Ricenbaw v. Kraus, 157 Neb. 723, 61 N. W. 2d 350; Snyder v. Platte Valley Public Power & Irr. Dist., 144 Neb. 308, 13 N. W. 2d 160, 160 A. L. R. 1154; O'Shea v. North American Hotel Co., 109 Neb. 317, 191 N. W. 321; 15 Am. Jur., Damages, § 20, p. 410; 25 C. J. S., Damages, § 28, p. 496. The evidence is insufficient to sustain a finding of compliance with the conditions precedent of the contract of employment relative to bonuses or to sustain recovery by appellee for any amount of bonus mentioned in the contract.

Appellee claimed recovery of damages on his first cause of action as follows: $12,350 for weekly salary

from September 15, 1952, and interest thereon at legal rate; $10,000 for annual bonus for 2 years as provided in paragraph 2 of the contract and interest thereon at legal rate; $33,245.02 additional bonus as provided in paragraph 3 of the contract and interest on $3,760 of that amount at legal rate. Appellee claimed recovery on his second cause of action of $936.60. The verdict of the jury was for appellee in the gross amount of $43,-443.40. The district court denied the motion of appellant for judgment notwithstanding the verdict or, in the alternative, for a new trial; vacated all of the verdict except $9,398.60, consisting of $8,462 on the first cause of action and $936.60 on the second cause of action; and entered judgment for appellee in the sum of $9,398.60 with interest from May 4, 1954, at legal rate. It is impossible to determine from the record the amount the jury allowed recovery on any of the items of the first cause of action or how much, if any, it allowed on the second cause of action. The action of the trial court was incorrect. The motion of appellant for a new trial should have been sustained.

The doctrine in this state in this regard is stated in Peacock v. J. L. Brandeis & Sons, 157 Neb. 514, 60 N. W. 2d 643: "Where it is clear that a verdict is excessive but there is no method by which the court can rationally ascertain the extent of the excess, a remittitur cannot be properly required since a remittitur would amount only to a substitution of the judgment of the court for that of the jury."

The cross-appeal of appellee should be and it is denied. The judgment should be and it is reversed and the cause is remanded to the district court of Lancaster County for further proceedings according to law.

REVERSED AND REMANDED.