THE REORGANIZED CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, APPELLEE, v. UNIVERSAL SURETY COMPANY, APPELLANT, ERWIN C. KORST, DOING BUSINESS AS KORST CONSTRUCTION COMPANY, INTERVENER-APPELLANT.

128 N. W. 2d 361

Filed May 15, 1964. No. 35507.

Ginsburg, Rosenberg & Ginsburg and Norman Krivosha, for appellants.

Healey & Healey, Carroll L. Olson, and Cline, Williams, Wright, Johnson, Oldfather & Thompson, for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action at law brought by The Reorganized Church of Jesus Christ of Latter Day Saints, a corporation, plaintiff, against Universal Surety Company, an insurance corporation, defendant. Erwin C. Korst, doing business as Korst Construction Company, intervened in this action. The purpose of the action was to recover damages upon a performance bond for an alleged breach of a construction contract executed between the plaintiff and the intervener, and guaranteed by the defendant.

The trial court determined that the parties did enter into a written supplemental agreement dated July 20, 1960, which modified and changed a written agreement dated January 5, 1960, except as specifically changed by the supplemental agreement dated July 20, 1960; that the written supplemental agreement of July 20, 1960, and the written agreement of January 5, 1960, as modified by the supplemental agreement of July 20, 1960, together with the plans and specifications and general conditions incorporated therein as contract documents, fix the respective rights, duties, and obligations of the respective parties in this action; and that as a matter of law, the intervener did breach the terms and provisions of the agreement dated July 20, 1960, and defaulted thereon. The matter was submitted to a jury to determine if the plaintiff had performed its obligations or was willing to perform them within the terms of the agreement of July 20, 1960, and accompanying contract documents; that the plaintiff had sustained damages as a result of the default of the intervener; and the amount of damages the plaintiff had sustained as a result of such default. The jury returned a verdict for the plaintiff in the amount of $38,221.51. Following receipt of the verdict, the trial court entered judgment on the verdict, plus interest in the amount of $3,503.72, and costs. At a subsequent hearing the court revised the interest allowable to $2,924.37, and allowed attorneys' fees totaling $8,316.60 to be taxed as costs.

The defendant and intervener filed a motion for judgment notwithstanding the verdict, or in the alternative for a new trial, which motion was overruled. The defendant and intervener appealed.

For convenience we will refer to The Reorganized Church of Jesus Christ of Latter Day Saints as plaintiff or church; to the Universal Surety Company, a corporation, as defendant or surety company; and to the intervener as contractor, Korst, or intervener.

The church is an Iowa corporation with its principal place of business at Independence, Missouri. It is domesticated and existing in Lancaster County, and the owner of real estate situated at the northwest corner of Forty-fourth and South Streets in Lincoln. The defendant is an insurance corporation organized and existing under the laws of Nebraska and engaged in executing undertakings in suretyship. Korst is a building contractor.

The petition sets forth certain facts to the effect that the defendant surety company is liable on a performance bond executed to the plaintiff as owner that Korst, the contractor, would perform the obligations of a written contract dated January 5, 1960, and the supplemental contract dated July 20, 1960, between Korst and the plaintiff church relating to the construction of a church, which contract it is alleged that Korst violated. The plaintiff prayed for damages in the amount of $38,221.51.

The defendant's amended answer consists of a general denial, and alleges certain facts to the effect that there is no liability on the bond executed by the defendant to the plaintiff.

The intervener filed an amended petition alleging that he had a direct legal interest in the matter as a successor to defendant by virtue of the fact that no liability existed on the defendant unless liability existed on behalf of the intervener; and that the intervener, as principal on the bond, was obligated to answer and

to indemnify the defendant from liability which plaintiff might recover.

Other pleadings need not be set forth.

The defendant and intervener make numerous assignments of error which relate to the proposition that the trial court rejected certain parol testimony which was offered in support of the various theories presented by the defendant and the intervener. These assignments of error will be shown by the following contentions of the defendant and intervener.

It was pleaded that the document of January 5, 1960, and the bond supporting it were never intended to be valid and enforceable, and prior to the signing of the same there was an oral agreement that the same would not be binding and enforceable. On this proposition the defendant and intervener sought to offer parol evidence. In addition, the defendant and intervener assert that if the contract of January 5, 1960, was not valid and enforceable by virtue of it being a sham, then no bona fide dispute in fact existed and the agreement by the defendant and intervener to compromise and execute the document of July 20, 1960, would be without consideration; and that this was a question of fact requiring the introduction of parol evidence.

It is also contended by the defendant and intervener that one may offer parol evidence to show preliminary negotiations, leading to the execution of a written document, explain ambiguities contained in said written document, and display the intention of the parties, and that refusal of the trial court to permit such evidence constitutes prejudicial error as against the defendant and intervener.

The defendant and intervener also assert that where statements and representations as to future events are made with the intent at the time of their making to be false and untrue, and the party making the representations as to the future events intends at the time of making such statements not to perform, such statements as to

future events constitute actionable fraud, and parol evidence is admissible to show such statements; and that the trial court erred in refusing to permit parol evidence as before contended.

The defendant and intervener assert that the trial court is required to submit to the jury each material question of fact and the withdrawing of a question of fact from the jury constitutes reversible error.

The defendant and intervener assert that permitting the introduction of photographs in evidence which do not show items for which damage is sought, or are in any way relevant to the issues framed, constitutes prejudicial error, and that the trial court committed such error.

The defendant and intervener further assert that notes of meetings which tend to impeach official minutes already offered in evidence are admissible and the refusal of the trial court to admit the notes in evidence constitutes reversible prejudicial error. This relates to certain exhibits.

The defendant and intervener assert that interest for damages resulting from the failure to comply with the terms of a building contract are computed from the rendition of judgment; and that it is prejudicial error for the trial court to attempt to divide the amount of the judgment and assess interest on a portion of the judgment from the date of the breach while assessing the balance of the interest on the date of the judgment.

The defendant and intervener assert that the purpose of section 44-359, R. R. S. 1943, entitling a plaintiff suing upon a contract of insurance to recover attorneys' fees is to attempt to relieve the plaintiff of the burden of cost of recovery; where, however, plaintiff employs general counsel of its own so as not to necessarily incur additional expenses, it is an abuse of discretion for the trial court to award attorneys' fees in the amount of $8,316.60.

The defendant and intervener further assert that in an action for breach of contract one may only recover

damages that are probable, direct, and proximate consequence of the wrong complained of and such as may fairly be supposed to have been within the contemplation of the parties at the time of the making of the contract.

It will be noted that due to some of the above contentions, the defendant and intervener are concerned primarily with the right to offer parol evidence to establish sham, fraud, and want of consideration, none of which it is asserted the trial court permitted, and the auxiliary matter relating to attorneys' fees. Insofar as necessary to this appeal, we will discuss the above after a summary of the facts.

The plaintiff is a nonprofit corporation. It is the general church and includes branches, one of which is located in Lincoln. The Lincoln branch is a part of the general church.

On January 5, 1960, the contractor, Korst, and defendant surety company executed an owner's protective bond, Korst as principal and defendant as surety, to the plaintiff as owner, in the sum of $80,000, for material and labor to construct a new church to be located on the northwest corner of Forty-fourth and South Streets in Lincoln. This bond was signed January 5, 1960, by E. C. Korst and the attorney-in-fact for the surety company, in return for a premium of $600 paid by the plaintiff, which was received by the defendant and the bond was delivered.

The bond, by its expressed terms, stated that E. C. Korst, as principal, had executed a contract with the owner (plaintiff) dated January 5, 1960, for labor and materials to construct a new church building to be located as heretofore stated. A copy of this contract was by reference made a part of the bond.

The principal amount of the bond was $80,000. The bond provided that the obligation should be void if the principal should faithfully perform such contract of January 5, 1960, and pay all persons who had furnished labor or material for use in or about the above prem-

ises, and should indemnify and save harmless the owner from all costs and damages by reason of principal's default or failure to do so.

The bond required the work to be performed under the supervision of a duly qualified architect, but did not specify any particular architect. The bond contains specific provisions to be complied with in the event the contractor is in default.

The obligee of this bond is the plaintiff. There is no question relating to the plaintiff's right to bring this suit.

The contract of January 5, 1960, which is referred to in the bond, is a written contract and related written instruments duly executed by Korst, the contractor. The contract describes the parties. By its terms and included in the contract documents are drawings dated October 23, 1959, and November 16, 1959, and specifications consisting of 64 pages.

Sometime before 1959, there was a movement among the congregation to construct a new church. In 1956, a resolution creating a building committee was passed. This meeting was held in March 1956. Members were elected to serve on this committee. The building committee, by its bylaws, was empowered to deal for and on behalf of the branch in regard to the construction of the building. This committee was authorized to investigate all desirable ground sites; prepare factual information on available locations for action by the branch; make a survey of all phases of housing requirements; engage an architect to prepare preliminary drawings and floor plans and other matters; and after approval of the branch, then to authorize the architect to prepare specifications.

In 1959, the local branch was using a church at Twenty-sixth and H Streets, owned by the general church, and had purchased a site at Forty-fourth and South Streets for $9,000. In 1959, the church, after buying the lot,

had something over $30,000 in cash and bonds for investment in a new church building.

The local branch engaged a Lincoln architect by the name of Hemphill to prepare some plans and specifications of a church building, which he did, at an estimated cost of $68,000. Invitations for bids were issued, and bids were received and opened in April 1959. The lowest bid was $103,000. Mr. Hemphill resigned.

Korst, a general contractor in Lincoln, in the spring of 1959, learned from R. H. Silvers, a subcontractor, that the branch desired to construct a church. Korst examined the Hemphill plans and contacted him. Korst would not agree to build a church in accordance with Hemphill's plans and specifications. Nothing further was done in connection with the Hemphill plans.

Korst knew about Milton Costlow, an architect from Kansas City, who subsequently drew certain plans and specifications. Korst first met Costlow August 17 or August 18, 1959. Costlow contacted Korst and arrangements were made for a meeting with the chairman of the church building committee. On August 17, 1959, there was a meeting of the building committee. Costlow was present and showed various plans of churches. Costlow was instructed to contact Korst and find out what he was willing to do. While meeting with Korst, Costlow showed him plans or preliminary drawings for a church.

On August 25, 1959, there was a meeting of the building committee. Silvers, Korst, and Costlow were present. Costlow presented the committee with a drawing of the Meyer Boulevard church, a preliminary drawing which indicated a floor plan, a straight-line drawing to fix some elements of a building without indicating the type of fixtures, finish, or nature of construction and is not a drawing from which a firm bid could be made.

There was another meeting held by the building committee on September 8, 1959, at which Korst, Costlow, and Silvers were present, the latter being there for a while.

The construction of the church was discussed with reference to eliminating a certain portion of the proposed building. On August 25, 1959, Korst agreed to build the church.

There was a meeting of the congregation of the church on September 30, 1959, at which Korst, Costlow, and Knudsen were present. A preliminary drawing was presented. No other plans and specifications were available at that time. The preliminary plans were approved and the congregation moved to accept Korst as contractor and Costlow as architect for the building. It was indicated that the working drawings would be prepared.

The building committee met on November 19, 1959, with the architect, to discuss the construction of the church and the excavation of the project. The excavation started early in December 1959.

Between October 28, 1959, and November 19, 1959, Korst ordered materials and obtained bids from subcontractors.

When Korst started the excavation, he had only a floor plan of the construction.

In the minutes of the building committee meeting on December 9, 1959, Norman Prucha agreed to approach Korst in regard to signing the contract and the performance bond. Korst said Prucha did not approach him until December 12, 1959. At that time construction had already started. A contract dated November 30, 1959, was signed by Korst. This is a form of agreement between the contractor and the plaintiff, dated November 30, 1959, wherein the plaintiff intends to erect a new church at Forty-fourth and South Streets. The contractor agrees to provide all labor and materials and do all things necessary and proper for the construction and completion of the work shown and described in the drawings at a maximum figure of $80,000. Nothing was said to Korst about a performance bond at that time, and no arrangements were made to obtain one.

The contract was sent to Kansas City by Harold Reid, pastor of the congregation at that time.

On January 5, 1960, Korst had a conversation with Norman Prucha. Prucha told Korst it would be necessary for him to sign a performance bond, and that was the first time anything was said to Korst about such a bond. At the time Korst signed the performance bond, he had not signed the contract dated January 5, 1960. Korst first learned about the contract of January 5, 1960, when he went to the building committee meeting. That evening he signed the contract.

This contract was an agreement between the owner and contractor relating to the church building. Article 12 of the contract provided that the contractor should, between the first and seventh of each month, deliver to the architect a statement, sworn to if required, showing in detail and as completely as possible all money paid out by him on account of the cost of the work during the previous month for which he was to be reimbursed under Article 5, with original payrolls for labor, checked and approved by a person satisfactory to the architect.

Before January 5, 1960, the manner of payment on the construction came up, and Korst did not want to handle the church's money. Delno Knudsen was pastor or presiding elder of the church at that time and served as secretary of the building committee until 1961, then as chairman. He had paid bills during January 1960, directly to Korst for obtaining a building permit, insurance, and a lot survey, money which Korst had advanced for these items. He also paid other bills during January 1960. A check to a subcontractor or supplier was submitted to Korst. Between January 5, 1960, and some time in April, Knudsen did pay bills on this construction job. The contract made provision for the manner of payment by obtaining a certificate from the architect.

Between January 1960, and July 20, 1960, although

the contract required a 10 percent retention, no sums were withheld from payment.

In May 1960, Korst began to complain about the church's failure to pay bills. On May 24, 1960, Korst withdrew from the job. Thereafter there was a period of negotiation in which Korst participated, also Costlow, and the building committee.

From the time the excavation started until May 1960, various problems incident to the performance of the work arose. These are summarized by minutes of the building committee and by letters of the architect.

A letter by Costlow and Champlin to Knudsen, dated May 10, 1960, stated: "* * * the General Church desired to execute the contract as written: 10% retention and certification of all payments by our office (Costlow and Champlin architects) to be required. * * * we do not have a record of all monies we believe to have been paid by the church." This has to do with changes in the accounting, relieving Knudsen from keeping records, and deals with a change in the accounting system.

A letter from Costlow and Champlin, architects, to Harold Reid, pastor, had reference to the substitution of a 12-inch block basement wall instead of the laminated 12-inch block wall composed of an 8-inch block and a 4-inch block previously discussed, then continued with reference to whether or not there was water seepage into the basements in neighboring houses, and if there was no evidence of excess of soil pressures in this neighborhood, then substitution might be acceptable. The letter stressed that a good foundation was the best thing that could be incorporated into a building, and if the church could afford extra money, then by all means it should have the laminated block wall.

The building committee met on May 24, and May 25, 1960. Korst complained about the 10 percent retention; a bricklayer's complaint because he had not been paid; poor supervision on the part of the architect; that he did not want to set up bookkeeping as the architect

wanted; no authorization to proceed with the water-proofing of the basement walls; and that he was keeping costs down and the architect, by continually changing the specifications, was running the costs up. It was agreed that all bills would be paid. The committee further considered that the foundation wall was not according to specifications and that some means would have to be arrived at to correct the hazard involved because of the present construction; that the brickwork around the concave was of very poor quality and would have to be torn down and done over; that the brick pilasters would have to be rebuilt, window openings cut, the partitions at the window intersections corrected, and that the brickwork on the east and south walls be cleaned with chemicals or it would have to be torn down; that Korst had violated the contract which called for the cleaning of this brickwork after every day's work; and that all volunteer labor from the branch must cease.

Korst ceased working on the project in May or June of 1960.

A meeting of the building committee was held on June 11, 1960. The attorney for the contractor approached the matter on the basis that Korst was not a big-time contractor; that due to the fact that Mrs. Silvers was a member of the church, he wanted to build it; and that Korst had been "wheedled" into signing the contract. Costlow stated that Korst had had the contract and general terms for several weeks and had consulted an attorney. The 8 and 4-inch laminated wall was discussed as against the 12-inch block wall. To take care of the waterproofing, an expert opinion was called for. Silvers agreed to go up to $300 for waterproofing. Silvers and the attorney for the contractor agreed to provide their original cost estimates and names of subcontractors in order that percentage values could be worked out.

On May 16, 1960, the defendant was notified of the situation by the architect in a letter which stated: "We

have received notification from the owner and contractor on May 16, 1960, of the above referenced project that the contractor is not willing to prosecute the work under the terms of the contract i.e. 10% retention of monies and method of architect's certification of payment.

"We would appreciate your counselling Mr. Korst in the matter and enforce completion bond on the project. Please notify us of the results of your counsel."

Meetings were held thereafter with counsel and Korst's attorney, and an agreement was reached which was reduced to writing and signed on July 20, 1960.

It was stipulated with reference to the supplemental agreement of July 20, 1960, that the signatures on the document were those they purported to be; that the agreement was signed in the presence of counsel for Korst; that counsel for Korst had been present during prior negotiations between the parties and had read the supplemental articles of agreement before it was signed; that there was a delivery of the document to the respective parties; that the supplemental articles of agreement was executed after Korst had ceased work and executed for the purpose of inducing Korst to proceed with the construction of the church; that the supplemental contract was not a sham; and that Korst intended to perform the work called for under the agreement in accordance with the terms thereof.

The supplemental agreement of July 20, 1960, altered the plaintiff's obligations under the earlier written contract of January 5, 1960, in the following manner: It permitted Korst to resume his work under the contract to build the church on the terms and conditions set forth in the supplemental articles of agreement dated July 20, 1960, thus precluding the church from asserting remedies available to it against the contractor and the surety company arising from the contractor's refusal to proceed. One such right was the right to terminate the contract as provided in Article 22 of the general

conditions. It fixed in writing the deficiencies in Korst's work up to that date. It agreed to a change from the original plans and specifications concerning the construction of basement walls and the waterproofing thereof. It agreed to the manner in which payments were to be made in the future. It agreed to make separate checks for each materialman or subcontractor, rather than dealing directly with Korst on the basis of the terms of the contract of January 5, 1960. It agreed to deletion of a portion of the general conditions of the contract, and agreed that no payments would be withheld until after 50 percent of the construction price had been paid by the owner. It agreed to further examination by the parties to ascertain the manner of making payments to the contractor after 50 percent of the construction price had been paid out, and again after 75 percent of the construction price had been paid, and again when 90 percent of the construction price had been paid. It agreed that the value of volunteer labor, which would be credited on the prior contract of January 5, 1960, amounted to only $250, and that subsequent volunteer labor would not be credited on the contract price thereafter, even though furnished by members of the church. It agreed to a change in the size of the outside windows, as provided in paragraph 6 of the supplemental articles of agreement. The plaintiff also agreed, by the supplemental articles of agreement, that in all other respects it was bound by the provisions of the written contract of January 5, 1960, which placed numerous obligations and limitations on the plaintiff.

The agreement of July 20, 1960, also provided: "In all other particulars it is mutually understood and agreed that the aforesaid contract of January 5, 1960 shall apply, except as specifically changed by this supplemental agreement, and it shall apply as respect to all the general conditions, specifications, plans and drawings which have been heretofore approved, and if there are to be any changes from the said plans and specifications, they

shall be done in writing, agreed to by all of the parties in harmony with the procedures set forth in the contract documents relating to 'Change Orders'. On the part of the Owner the said 'Change Orders' shall be signed by the chairman of the building committee of the Lincoln branch congregation of said church."

There is nothing in the original contract documents or in the supplemental articles of agreement specifying that any particular architect was required to supervise the completion of the work. The bond states: "The Contract, including the completion thereof after default, if any, shall be prosecuted under full supervision of a duly qualified architect."

The general conditions provide in Article 38: "In case of the termination of the employment of the Architect, the Owner shall appoint a capable and reputable Architect, against whom the Contractor makes no reasonable objection, whose status under the contract shall be that of the former Architect; * * *."

The services of the architects Costlow and Champlin were terminated on August 2, 1960. Clark and Enersen of Lincoln were immediately retained as architects. No objection was made to the change by Korst, and he continued to work with Clark and Enersen for 10 months thereafter and until he quit work in June 1961.

Costlow stated that he was having difficulty with the local branch of the church in June 1960. On July 29, 1960, the first general discussion of his leaving the job as architect took place. He made an inspection of the job on August 3, 1960. He resigned on August 11, 1960.

Nothing in the supplemental agreement of July 20, 1960, indicates any understanding that the surety company or the contractor would not be bound as agreed if Costlow did not continue as the architect. Provisions of the specifications relating to a change of architects were incorporated in the supplemental contract.

Costlow and Champlin were paid their fees for the work they had done.

Clark and Enersen entered into a letter agreement with the church on August 13, 1960, to provide inspection service and supervision to complete the job, and Korst worked with them toward completing the contract under the supplemental agreement of July 20, 1960, until he walked off the job in June 1961. Clark and Enersen continued on the job after Korst quit. They made a list of items remaining to be done on the job on June 15, 1961, at the request of the attorney for Korst. They prepared specifications of work remaining to be done on the contract of July 20, 1960, in order to complete the job and supervised the bidding and contractual arrangements for this work.

The low bid for completing the work was submitted by the Walter J. Broer Construction Company, in the sum of $31,960, which was a fair and reasonable charge for completing the work in accordance with the contract of July 20, 1960, and the plans and specifications referred to therein.

Clark and Enersen continued to supervise the construction of the church until it was completed, and rendered their statement of services, which was paid.

The Walter J. Broer Construction Company completed the church in accordance with the plans provided by Clark and Enersen. Account was kept of any other work performed by Broer and this was separately accounted for by the church.

There was some contention relating to the heating contract and the electrical plan which need not be set forth.

Mechanics' liens were filed against the property by A. A. Leupold for $967.45, and by Cobleigh Electric Co. for $2,043.01 for work performed for Korst. It was stipulated that none of these bills had been paid and the amounts were fair and reasonable for materials furnished and services performed.

The laminated wood arches and roof decking were involved in a railroad accident. The arches were not dam-

aged, but the roof decking was. The railroad made a settlement in the amount of $2,824, of which the church received no part. Korst received $824 of this amount for work he was to do. The balance of $2,000 was paid to the supplier and credited on the bill. No credit was given to the church on the total contract price of $80,-000. The church received damaged and inferior materials for which $2,000 was paid by the railroad in damages.

The laminated wood arches were stored on the job for 6 or 8 months. The contract required Korst to protect this material. The architects urged covering this material, which was not done, and the layers of wood came unglued and separated in certain areas.

An architect specialized in estimating costs testified that it would cost $888.50 to repair the damage resulting from the delamination, and that the reasonable cost of smoothing and refinishing the defective joints on the decking was $345.

The total amount paid out by the church under the contract during the period Korst was working on the job was $79,751.61. This did not give the church credit for discounts to which it was entitled. Korst testified: "All discounts on all materials, they would get that." The discounts totaled over $800. If the discounts were added back the total paid by the church was over $80,-500, and no claim was made for the overpayment of $500.

The foregoing constitutes the material and relevant evidence upon which a determination of this appeal must be made.

The following are applicable.

In Gerdes v. Omaha Home for Boys, 166 Neb. 574, 89 N. W. 2d 849, this court said: "The parol evidence rule is not merely one of evidence but is a rule of substantive law which declares that certain kinds of facts are legally ineffective and forbids them to be proved."

In Barkalow Bros. Co. v. English, 159 Neb. 407, 67 N. W. 2d 336, this court said: "It has long been the

law of this state that if persons to a transaction have put their engagement in writing in such terms as import a legal obligation without uncertainty of the object or extent of the engagement, it is conclusively presumed that the entire engagement of the parties and the extent and manner of their undertaking have been reduced to writing, and any parol agreement is merged in the written contract and testimony of prior or contemporaneous conversations is incompetent."

In Bitler v. Terri Lee, Inc., 163 Neb. 833, 81 N. W. 2d 318, this court held: "If negotiations between parties result in an agreement in reference to the subject matter thereof and if they reduce their agreement to writing, execute, and deliver it, the writing, in the absence of fraud, mistake, or ambiguity, is the only competent evidence of the contract." In the opinion in that case this court quoted with approval the following from Annotation, 33 A. L. R. 2d 968: "All oral negotiations or stipulations between the parties, preceding or accompanying the execution of the written instrument, are regarded as merged in it, and the instrument is treated as the exclusive medium of ascertaining the agreement of the parties to it. * * * The reason for this rule is that it is only reasonable, where parties have entered into a written agreement, to suppose that they have introduced into the instrument every material term and circumstance; and, consequently, all parol testimony of conversations made by either of them, whether before or after, or at the time of, the completion of the contract, will be rejected."

Master Laboratories, Inc. v. Chesnut, 157 Neb. 317, 59 N. W. 2d 571, states the rule in this manner: "When the written agreement shows a complete legal obligation, without uncertainty or ambiguity as to the object and extent of the engagement, it is conclusively presumed that the whole agreement of the parties was included therein. The fact that a point has been omitted which might have been embodied therein will not open the

door to the admission of parol evidence in that regard. * * * The parol evidence rule is not merely one of evidence, but is a rule of substantive law, which declares that certain kinds of facts are legally ineffective, and forbids such facts to be proved at all." See, also, Gerdes v. Omaha Home for Boys, *supra*.

The defendant and intervener rely on Coffman v. Malone, 98 Neb. 819, 154 N. W. 726, L. R. A. 1917B 258. In the cited case Snyder, Malone, and Coffman owned all the capital stock of a corporation named after them and doing a livestock commission business. Slight differences as to the conduct of the business arose. An agreement was entered into between the parties whereby Snyder and Coffman were to sell all of their stock to Malone. There was a secret oral agreement between Coffman and Malone to the effect that this agreement to sell was not binding on Coffman and Malone and that the signed agreement was merely executed in order to induce Snyder to sell his interest. After Snyder transferred his stock, Coffman continued in the business. Two weeks later Coffman tendered an assignment to Malone, demanding that Malone purchase the stock from Coffman, which Malone refused to do. Malone, by answer, claimed that the writing was executed for the sole purpose of purchasing the interest of Snyder, and that there was an oral agreement that it was not to be performed. Trial was had to the court. Evidence of the oral agreement was held to be inadmissible. This court reversed the judgment of the trial court, saying: "This evidence was not offered with the view of contradicting, varying, or explaining the language employed in the written instrument, but to establish a fact or circumstance collateral to the original writing which would control its effect or operate as a binding engagement. * * * If there was an express agreement between Coffman and Malone that it was not to be carried out, Malone in signing was acting, not alone for himself, but also for the plaintiff, and in that event it never became a

binding obligation. 'The existence of a written contract or instrument, duly executed between the parties to an action and delivered, does not prevent the party apparently bound thereby from pleading and proving that contemporaneously with the execution and delivery of such contract or instrument the parties had entered into a distinct oral agreement which constitutes a condition on which the performance of the written contract or agreement is to depend.' Norman v. Waite, 30 Neb. 302."

The rule announced in Coffman v. Malone, *supra,* is not applicable to the instant case. In the instant case the surety company did not contend that there was no surety bond in effect. It accepted the premium of $600 and never offered to return any part of that amount. When notified of the problems in the spring of 1960, the surety company did not contend that the bond was a sham. It responded by executing the agreement of July 20, 1960, in which it said that the bond could in no way be weakened by the supplemental agreement, but should continue in full force and effect for the purpose of guaranteeing the construction of the church according to the terms and conditions of the bond.

When notified of the default in June 1961, the surety company did not contend that the bond was a sham or that it was invalid. It acknowledged the existence and the controlling effect of the bond, and based its denial on the contention that no default had occurred, stating: "Mr. Healey, this company, as surety on the bond for this church construction project, takes the position no default has taken place and, consequently, the bond language under which you are proceeding is not applicable."

It was stipulated that exhibit No. 1, which is the supplemental agreement, was not a sham, and that Korst intended to perform the work called for under this contract in accordance with the terms thereof. The supplemental agreement referred to was dated July 20, 1960.

The bond states: "Whereas, Principal has executed

contract with Owner, dated January 5, 1960 for Labor and Materials to construct new church building to be located on the northwest corner of 44th and South Streets, Lincoln, Nebraska copy of which contract is by reference made a part hereof."

The contentions of the contractor and the evidence which he offered conflict with the written provisions of the bond. To permit such evidence to be received would constitute abandonment of the parol evidence rule.

In addition, there is another distinction between the facts in the instant case and those in the case of Coffman v. Malone, *supra.* In the cited case it was contended that there was no contract between the parties, and consequently evidence that there was no contract did not vary the terms of a written contract. In the instant case, the surety company and Korst concede that some contract existed between Korst and the church for construction of the church. The evidence which was sought to be produced was to the effect that they had a contract to built the church; that it had a ceiling on it of $80,000; that it was to be done generally in accordance with the plans which were a part of the contract dated January 5, 1960; but that there were certain differences. The result of this would be nothing more than saying that they should be able to show by parol evidence that the written contract did not correctly state the agreement in all particulars, which would be contrary to the parol evidence rule.

No evidence was offered that the surety company or anyone a party to the agreement of July 20, 1960, did not intend to be bound by it when it was signed and delivered.

As stated in Security Savings Bank v. Rhodes, 107 Neb. 223, 185 N. W. 421, 20 A. L. R. 412: "* * * when a written contract has been unconditionally delivered, in the sense that it is intended to take effect as a legal obligation, a contemporaneous oral agreement, providing that the contract is not to be performed if a certain

condition or contingency should occur, cannot be shown, as such proof would have the effect of adding to, varying or contradicting the express terms contained in the writing."

The defendant and intervener contend that the purported oral agreement gave Korst complete freedom in the construction of the church, allowing him to make such modifications in the plans and specifications as he deemed advisable.

The agreement of July 20, 1960, constituted a settlement of the disputed claims of the respective parties. Korst had started construction of the church and caused certain work to be done which did not meet the approval of the architect. One of such items was the installation of a 12-inch concrete block foundation wall rather than the laminated wall called for by the specifications. Acceptance of this change required satisfying the church and the architect that adequate waterproofing of the basement would be provided and would be satisfactory.

As to what liability the surety company had on its bond at that time, together with the other matters heretofore mentioned, confronted the parties and their attorneys in June and July 1960, and in a good-faith effort to settle the problems and to proceed to get the church constructed, the attorneys and the parties negotiated the settlement of these disputes.

When the supplemental contract of July 20, 1960, was entered into, under the conditions as shown by the evidence, it was in effect a compromise of the disputed claims of the parties, which constituted a good consideration for the contract.

In the light of the written contract executed by all the parties on January 5, 1960, and in view of the bond purchased by the plaintiff to guarantee performance of the written contract of January 5, 1960, the rights, if any, which Korst had under his alleged oral agreement were uncertain. This became even more apparent when the demands made by the architect and the building

committee of the church reached the point that Korst considered it advisable to stop further work under the contract and refused to proceed until the controversy was determined to his satisfaction.

The evidence establishes that the supplemental articles of agreement of July 20, 1960, were worked out in collaboration with counsel for Korst and for the surety company in this proceeding for the purpose of determining what the agreement was between the parties, determining the manner of making payments to Korst, settling differences of opinion between the architect and Korst as to the proper method of contruction, past and future, and other similar matters. The contention of the defendant and intervener is not sustainable.

The defendant and intervener assert that one of the conditions upon which the agreement of July 20, 1960, was executed was the representations made by the plaintiff that Costlow would be retained as architect and permitted to work with Korst in the effective completion of the building; and that the defendant and intervener were entitled to offer evidence of this agreement or condition in order to show that the agreement or condition of Costlow's employment was a condition precedent upon which the execution of the contract of July 20, 1960, was signed, and was part and parcel of that agreement.

The claimed representation that Costlow would remain as architect was not a material fact. There was considerable friction between Korst and Costlow. It was the duty of the architect to act impartially to insure that the structure was constructed in accordance with the agreement of July 20, 1960, and related documents.

Article 38 of the general conditions of the contract states: "In case of the termination of the employment of the Architect, the Owner shall appoint a capable and reputable Architect, against whom the Contractor makes no reasonable objection, whose status under the contract shall be that of the former Architect; any dispute in con-

nection with such appointment to be subject to arbitration."

There was no evidence offered that anyone intended any such claimed representation constituted the basis of obtaining Korst's signature to the agreement of July 20, 1960, nor was there evidence that Korst had been damaged by the change of architects. In fact it was acknowledged that the architects that replaced Costlow were good architects.

As shown by the evidence heretofore set out, the defendant and intervener have failed to meet the burden of proof on the contention that the agreement of July 20, 1960, was procured by fraud.

The defendant and intervener contend that the trial court is required to submit to the jury each material question of fact and the withdrawing of a question of fact from the jury constitutes reversible error.

The record discloses that the trial court permitted all evidence offered with reference to the want of consideration and the alleged fraud and claimed ambiguity of the contract dated January 5, 1960, as supplemented by the contract of July 20, 1960. It was admitted, as heretofore stated, that the contract of July 20, 1960, was not a sham. It was admitted that Korst intended to perform the work called for in that agreement in accordance with its terms. The trial court refused to admit evidence of alleged fraud incident to the contract of January 5, 1960, and correctly so since all of such questions were merged into the supplemental agreement of July 20, 1960.

This court said in Koehn v. City of Hastings, 114 Neb. 106, 206 N. W. 19: "In outlining the issues to be submitted to the jury, the court should limit the issues to such as are controverted and are supported by evidence. Issues presented by the pleadings, but not supported by evidence, should not be submitted to the jury. To do so is calculated to confuse and befog the real issues of fact which they are to determine." See,

also, Gain v. Drennen, 160 Neb. 263, 69 N. W. 2d 916.

We find no prejudicial error as contended for by the defendant and intervener on the issue above stated.

The defendant and intervener predicate error on the admitting of certain photographs into evidence. Such photographs show faulty workmanship on the part of Korst or incomplete work, and were relevant. Even in the event they were not relevant, they were harmless to Korst.

In Peterson v. Skiles, 173 Neb. 470, 113 N. W. 2d 628, this court said: "The admission or rejection of photographs in evidence is largely within the discretion of the trial court. In the absence of a showing of an abuse of discretion, error may not be predicated upon such ruling."

We find no prejudicial error was committed by admitting the photographs complained of into evidence.

The defendant and intervener sought to offer into evidence written memoranda taken by architect Costlow at the church building committee meeting. When the offer was made, official minutes of the meeting of the church committee had been accepted in evidence.

It is said in 32 C. J. S., Evidence, § 696, p. 590: "Under certain circumstances, memoranda or written statements are admissible in corroboration of oral testimony. Written memoranda made at or about the time of the transaction to which they relate are sometimes admitted in evidence to corroborate the testimony of the person by whom they were made; and, according to some cases, memoranda with which a witness has refreshed his memory may be used to corroborate his testimony."

Such was the situation which the defendant and intervener sought to accomplish, and which the trial court denied, and upon which reversible error is contended for.

The more applicable rule appears in 20 Am. Jur., Evidence, § 416, p. 374, as follows: "The rule is generally recognized that the written record of meetings of di-

rectors, stockholders, or members of private corporations, or associations is the best evidence as to the proceedings at such meetings, and that oral evidence is inadmissible to prove what took place, or to prove the contents of the minutes at such meetings, unless, of course a sufficient foundation is laid by explaining the absence of the written record."

And, as stated in Annotation, 48 A. L. R. 2d 1260: "Although there is authority apparently to the contrary, it has been held or recognized in a number of cases that, the written record of the meetings of directors, stockholders, or members of a private corporation being the best evidence as to the proceedings at such meetings, oral evidence is inadmissible to prove what took place, or to prove the contents of the minutes of such meeting."

It therefore appears that the written minutes of the meeting constitute the best evidence. All other evidence would be inadmissible as not being the best evidence. Although a memorandum is not exactly oral evidence, it is, in effect, only an informal written record of oral evidence.

The defendant and intervener, in any event, were not prejudiced since the refusal to receive such evidence would be harmless if it was consistent with the terms of the contract of July 20, 1960, and related documents. If it was not consistent with such contract, it was properly excluded under the parol evidence rule.

The defendant and intervener contend that the interest for damages resulting from the failure to comply with the terms of a building contract are computed from the rendition of judgment; and it was prejudicial error for the trial court to attempt to divide the amount of the judgment and assess interest on a portion of the judgment from the date of the breach while assessing the balance of the interest on the date of the judgment. We have heretofore set forth the judgment of the trial court in this respect.

We believe that the holding in Jones v. Elliott, 172

Neb. 96, 108 N. W. 2d 742, which involved a building contract, is applicable. This court held that interest should be calculated at the time of the rendition of the judgment. We believe the facts in this case warrant this conclusion.

The defendant and intervener contend that the purpose of section 44-359, R. R. S. 1943, entitling a plaintiff suing upon a contract of insurance to recover attorneys' fees is to attempt to relieve the plaintiff of the burden of cost of recovery; where, however, plaintiff employs general counsel of its own so as not to necessarily incur additional expenses it is an abuse of discretion for the trial court to award attorneys' fees in the sum of $8,316.60.

It appears that the firm that tried the case and made the preparation previous thereto for trial, was allowed the sum of $5,008.50, as costs, while a law firm that had previously been employed and had done some preliminary work with reference to the trial and other matters connected with this litigation and because of an unfortunate circumstance the senior member was forced to retire, was allowed the sum of $3,308.10. From a review of the record relating to this matter, we conclude that the trial court did not abuse its discretion in allowing the firm that tried the case and was required to go back and review all the preliminary steps before the trial and make preparation therefor, and was allowed the sum of $5,008.50, that this did not constitute an abuse of discretion on the part of the trial court. However, with reference to the $3,308.10 allowance for attorneys' fees as costs to the firm that took the preliminary steps and by certain circumstances was obliged to withdraw, this should not be allowed.

Other assignments of error raised by the defendant and intervener need not be determined.

We conclude that the judgment of the trial court should be modified to the extent that interest at the rate of 6 percent per annum should be allowed on the

amount recovered by the plaintiff from February 8, 1963; the date of rendition of judgment in the district court; that the attorneys' fees in the amount of $3,308.10 allowed to the firm that was unable to participate except in the preliminary steps leading to the litigation should be disallowed; and that in all other respects the judgment of the trial court should be affirmed as modified. The cause is remanded so that the interest on the judgment as heretofore noted may be arrived at, and the attorneys' fees disallowed as heretofore stated.

AFFIRMED AS MODIFIED, AND CAUSE REMANDED.